Argued March 22; affirmed April 12, 1938

MEYER *v*. NEDRY ET AL.

(78 P. (2d) 339)

Department 2.

*Wendell K. Phillips*, of Portland (Sheppard & Phillips and Willis Potter, all of Portland, on the brief), for appellant.

*Jesse G. Warrington* and *Thomas R. Mahoney*, both of Portland, for respondent.

BAILEY, J. This is an action to recover damages for malicious prosecution. From a judgment in favor of the plaintiff, Walter Meyer, against Brit Nedry and Dirickson Nedry, the defendant Brit Nedry appeals.

On December 25, 1936, the plaintiff, Meyer, was driving his automobile toward Portland on Barbur boulevard, a four-lane super-highway in Multnomah county, Oregon. Following closely behind him was the defendant Dirickson Nedry, a youth about 19 years of age, driving the automobile of his father, Brit Nedry. Near the entrance to his home the plaintiff started to turn to his right from the highway and a collision occurred between his car and the one driven by Dirickson Nedry, causing severe damage to the Nedry car and some injury to Dirickson Nedry and his two companions in the car.

Approximately three-quarters of an hour after the collision the defendant Brit Nedry arrived at the scene of the accident, accompanied by his son, Dirickson, and the latter's companions. They were joined by Deputy Sheriff Stanley of Multnomah county, who had been sent there to make an investigation. While there some discussion was had between the defendants and Officer Stanley concerning the cause of the accident, and according to Brit Nedry's testimony it was at the instance of Stanley that he later went to the office of the district attorney of Multnomah county, apparently to see about having the plaintiff arrested.

Stanley, according to his testimony, talked with Dirickson Nedry and his two companions at the scene of the accident. He was asked, "what recommendation you made, if any, as a result of your investigation". His answer was: "From the information by questioning the witnesses found there, he asked my advice what to do, and I advised him to see the district attorney." It

is not entirely clear from the record to whom Stanley was referring as having asked his advice, although prior to this testimony he stated that he had talked with Mr. Nedry and two boys with him, and identified as Dirickson Nedry the "Mr. Nedry" to whom he then referred. At another place in the testimony he stated: "In investigating the accident, the information I had received from the witnesses, the driver of the car and the two boys with him, he wanted to know  *   *   *". Here the testimony was interrupted by numerous objections. Then Stanley was asked, "In whose presence was your recommendation made, Officer?" His answer was, "To Dirickson Nedry, Robert Cross and Boydell E. Nedry", of whom the latter two were Dirickson's companions in the automobile at the time of the accident.

On cross-examination, Stanley, after stating that he had discussed the accident with the younger Nedry and his companions, testified thus:

"Q. Did they ask your advice as to having him arrested? I am speaking now of Mr. Nedry. A. They asked me my advice; yes, they did.

"Q. How did they put it, do you remember? A. Asked me what they should do, whether I thought they had a case.

"Q. Based on what they told you? A. On what they told me."

On Sunday following the accident the defendant Brit Nedry and his son Dirickson called on the plaintiff at his home. Prior to this call, however, Brit Nedry had called at the district attorney's office and discussed the matter with one of the deputies in that office. At the plaintiff's residence the plaintiff and the defendant Brit Nedry entered into a somewhat heated discussion as to who was responsible for the accident, the plaintiff or Dirickson Nedry. According to plaintiff's testimony,

the father asked him what he "was going to do about that accident, about that car of his smashed up". His further testimony in this connection is as follows:

"Q. What did you say? A. I said, 'nothing'. And he wanted to know the reason why, and I told him because I felt I shouldn't have to pay for anything which wasn't my fault. And then I and his son, we started arguing over the fact that I was right and he was right, and pretty soon the father said, 'Well, come on, son, we are not getting anywhere this way, we will take it up in higher hands'."

Dirickson Nedry, the son, testified concerning this incident as follows:

"Q. You stated you made no demands on Mr. Meyer, do I understand that to be correct? A. Yes, that is correct.

"Q. Who did make the demands? A. My father talked to him, he did not make any demands at all.

"Q. What did he talk to him about? A. He asked him if he wanted to do anything about the damage to the car. There were no demands or threats or anything else."

The accident occurred on December 25 and on December 28 Brit Nedry and his son called at the plaintiff's home. It was between those dates that Brit Nedry had gone to the office of the district attorney, where he had consulted Mr. Hodler, one of the deputies in that office. The only evidence as to what occurred there was given by Hodler, who testified as follows:

"Q. Now, prior to the occasion on which you issued this complaint on the 11th of January, 1937, had you discussed with Mr. Brit Nedry the issuance of that complaint, or the issuance of a complaint? A. Yes, Mr. Nedry called at our office and related the circumstances of the accident.

"Q. And did he ask you at that time to issue a complaint? A. No. I don't think he did, I think I requested

him to bring his son in if he wanted a complaint. When he was relating the story to me, why of course I knew that it was just hearsay as far as he was concerned, and that he knew nothing about the accident, and I told him to bring his son in or have his son come in.

"Q. You told him to bring his son in? A. Yes, he told me just what his son had related to him."

On cross-examination, Mr. Hodler further testified that the elder Nedry did not "purport to know anything about the facts of that accident". The witness stated that he knew that what was being told him by Brit Nedry was hearsay, and that the elder Nedry could not be used as a witness, and in addition that he did not believe that he had seen him since that meeting in the office.

On January 11, 1937, the son called at the district attorney's office and took up the matter of the accident with the deputy to whom his father had talked. When asked at whose instigation he went to the district attorney's office, he answered: "I went to the district attorney after my father had given me word that the district attorney wanted to see me". He further stated that his father had gone to the district attorney's office ahead of him and that he had discussed the details of the accident with his father before going to the district attorney's office. The son further testified as follows:

"Q. Now, Mr. Nedry, in your conversation with your father prior to the time of your going to the district attorney's office and getting this warrant, was anything said between you and your father as to the advisability of having Mr. Meyer arrested? A. I don't recall at all.

"Q. Pardon me? A. I don't recall that we had discussed the advisability of having him arrested.

"Q. Did your father have a conversation with you about the matter of having Mr. Meyer arrested after he

returned from his call on Mr. Hodler? A. He had told me to go in and see Mr. Hodler and tell him the facts of the case."

The younger Nedry further stated that he told Mr. Hodler all the facts that he knew concerning the accident.

At the time the son called at the district attorney's office, January 11, the deputy district attorney drew up a complaint in the district court of the state of Oregon for Multnomah county, charging the plaintiff herein with reckless driving in violation of chapter 360, § 19a, Oregon Laws 1931, which complaint was verified by the defendant Dirickson Nedry before one of the district judges. On January 12, Meyer was arrested. Upon a jury trial he was found not guilty of the charge. Shortly thereafter this action was instituted.

There is only one question presented on this appeal. At the close of the testimony, defendant Brit Nedry moved for a directed verdict on the ground "that the plaintiff had failed to prove want of probable cause as to him, or that he had any connection with the prosecution of the plaintiff".

In his opening brief the appellant cites numerous authorities to the effect that in order to sustain an action for malicious prosecution, the burden rests on the plaintiff to prove that the prosecution was malicious and without probable cause. However, in his reply brief he states that "the question of malice has no particular bearing upon this appeal whatsoever".

■ The acquittal of Meyer on the charge of reckless driving is not *prima facie* evidence of the want of probable cause for the prosecution: *Eastman v. Monastes,* 32 Or. 291 (51 P. 1095, 67 Am. St. Rep. 531). To establish this essential element of his case,

the plaintiff introduced such evidence as he deemed necessary to establish the fact that he was not at fault, and that the automobile collision was due to the carelessness and negligence of defendant Dirickson Nedry. The question of the sufficiency of the evidence to sustain the verdict against Dirickson Nedry is not here involved.

■ It is stated in 38 C. J. 395, § 23, as follows:

"The test of liability in an action for malicious prosecution is: was defendant actively instrumental in putting the law in force? To sustain the action, it must affirmatively appear as part of the case of the party demanding damages that the party sought to be charged was the proximate and efficient cause of maliciously putting the law in motion. Mere passive knowledge or acquiescence or consent in the acts of another is not sufficient to make one liable. To impose liability there must be some affirmative action by way of advice, encouragement, etc."

Further, in regard to this matter we find in 38 C. J. 457, § 115, this statement:

"All persons who originate, aid, or abet in, or voluntarily participate in, such original proceeding are liable as principals jointly or severally if they acted with malice and without probable cause."

The appellant argues that he did not in any way aid or abet in the malicious prosecution of Meyer. He asserts that the only thing which he did was to make a full disclosure to the deputy district attorney of what his son had told him concerning the accident, and that the deputy district attorney refused to take any action for the arrest of Meyer based on his statement, for the reason that it was hearsay. Had Brit Nedry's activities ended here we would have an entirely different question for determination from that presented by the record.

After his visit to the office of the district attorney, Brit Nedry and his son called upon Meyer, and demanded of him payment for the damages done to Brit Nedry's car. When Meyer refused to assume responsibility for the accident, Brit Nedry, addressing his son, said, in the presence of Meyer, "come on, son, we are not getting anywhere this way, we will take it up in higher hands". Some two weeks later the son, at the suggestion of his father, went to the district attorney's office and caused a complaint to be issued against Meyer for reckless driving.

Defendant Brit Nedry's connection with the original proceeding against Meyer may be shown by circumstantial evidence: *Thienes v. Francis,* 69 Or. 165 (138 P. 490). All the facts hereinbefore recited concerning the activities of Brit Nedry and the inference which may be drawn therefrom should be considered in determining whether Brit Nedry aided or abetted in the original prosecution. We cannot say as a matter of law from the facts before us that Brit Nedry was not the proximate and efficient cause of maliciously putting the law in motion. That question was properly submitted to the jury: *Thienes v. Francis,* supra. The judgment appealed from is therefore affirmed.

BEAN, C. J., and RAND and LUSK, JJ., concur.